UNITED STATES of America

v.

Igor VEKSLER, Eduard Sikar.

Cr. A. No. 93–147(–8,–18).

United States District Court, E.D. Pennsylvania.

Aug. 31, 1994.

---

**1338**

William A. DeStefano, DeStefano & Warren, P.C., Susan Gibson Durant, Philadelphia, PA, for Veksler and Sikar.

Robert E. Courtney, Mary E. Crawley, Pamela Foa, Asst. U.S. Attys., Philadelphia, PA, for U.S.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Defendants Igor Veksler and Eduard Sikar were among eighteen defendants named in a ninety-seven count indictment that alleged a conspiracy to evade state and federal taxes on the sale of diesel fuel. Veksler was named in Counts One, Two through Seven and Seventy-five of the indictment; those counts charged him with conspiracy, six counts of wire fraud, and one count of tax evasion. Sikar was charged in Count One with conspiracy. After a jury trial, Veksler was convicted on Counts One through Seven and acquitted on the tax evasion charge. Sikar was convicted of conspiracy. Both defendants have filed post-trial motions for acquittal based on insufficiency of the evidence at trial.

The issue before me is whether, under the standard set by the Third Circuit, the government presented sufficient evidence at trial for the jury to find that the defendants knowingly engaged in the conspiracy charged in Count I of the indictment.[1] Specifically at issue here is whether the government presented sufficient evidence to permit the jury to conclude that the defendants had knowledge of the illegal objective contemplated by the conspiracy with which they are charged. *United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir.1991); *United States v. Wexler,* 838 F.2d 88, 90–91 (3d Cir.1988). I find that the government has met its burden as to defendant Veksler, and will deny his motion for acquittal. As to defendant Sikar, however, I find that, under the Third Circuit standard, the government failed to present sufficient evidence at trial to allow a reasonable jury to infer that Sikar had knowledge of the specific illegal objective contemplated in the charged conspiracy, and so will grant his motion for acquittal.

---

1. Veksler challenges his conviction on the wire fraud counts as well as the conspiracy count. Both charges require proof of specific intent: in this case, the intent to defraud the governments of the United States, Pennsylvania and New Jersey of excise taxes due on sales of diesel fuel. My discussion of the conspiracy charge, therefore, will also apply to and decide the same issue with regard to the wire fraud charges.

*The Legal Standard*

In deciding a post-trial motion for judgment of acquittal, I must

> view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences. A verdict will be overruled only if no reasonable juror could accept the conclusion of the defendant's guilt beyond a reasonable doubt.

*United States v. Coleman,* 811 F.2d 804, 807 (3d Cir.1987). I must credit all available inferences in favor of the government.

▉▉▉ The government's burden in a conspiracy prosecution is to prove the existence of an agreement to commit an unlawful act. It is not necessary that the government prove a formal agreement, merely that the defendants had a common goal and agreed to work together toward that goal. Although all elements of the government's case, including the existence of the agreement, may be proven entirely through circumstantial evidence, *United States v. Kapp,* 781 F.2d 1008, 1010 (3d Cir.), *cert. denied* 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986), "the sufficiency of the evidence in a conspiracy prosecution requires close scrutiny". *United States v. Coleman,* 811 F.2d 804, 807 (3d Cir.1987) (quoting *United States v. Cortwright,* 528 F.2d 168, 171 (7th Cir.1975). In order to sustain the conviction, there must be evidence tending to prove that the defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment. *United States v. Scanzello,* 832 F.2d 18, 20 (3d Cir.1987).

▉▉▉ Although the Third Circuit has never set forth a bright line rule as to how much circumstantial evidence is needed to establish that the defendant knew the unlawful purpose of the conspiracy with which he is charged, the court has made it clear that evidence that the defendant knew or suspected that something illegal was occurring and was willing to participate in it is insufficient: the government must show that the defendant understood the specific crime goal of the conspiracy.

In *United States v. Salmon,* 944 F.2d 1106 (3d Cir.1991), the Third Circuit upheld the conspiracy convictions of two defendants who engineered the sale of a package of cocaine. At the same time, however, the court reversed the conviction of a third defendant who aided in the surreptitious sale of the wrapped package, but was not shown to have had knowledge of the contents of the package. *Salmon,* 944 F.2d at 1114–16.

In *Wexler* the Third Circuit held that the government's evidence that the defendant had served as a lookout and assisted in the movement of a truck that contained a large quantity of hashish was insufficient to sustain his conviction for conspiring to distribute hashish, in the absence of any evidence that the defendant knew what was in the truck. *Wexler,* 838 F.2d at 91–92.

In *United States v. Cooper,* 567 F.2d 252 (3d Cir.1977), the Third Circuit reversed the conspiracy conviction of a man who travelled cross-country with a co-defendant in a truck carrying marijuana because there was no evidence that Cooper knew what was in the locked rear compartment of the truck. *Cooper,* 567 F.2d at 254–55. In *Cooper,* as in the other cases involving a conspiracy to distribute a controlled substance, the apparent illegality of the activity was not enough; without evidence that the defendant had been told or had figured out what was being transported or sold, the totality of the evidence was not enough for a reasonable juror to find that the defendant had knowledge of the specific illegal object of the conspiracy.

The Third Circuit's close scrutiny is not restricted to cases involving controlled substances. In *United States v. Coleman,* 811 F.2d 804 (3d Cir.1987), the Third Circuit upheld the judgment of acquittal for a defendant accused of conspiring to interfere with a prosecution witness' civil rights. The evidence showed that the defendant had a longstanding association with his co-defendant, the man against whom the witness was to testify, that he knew of his friend's impending trial, and that he rented the motel room in which the witness was murdered. There was, however, no evidence that the defendant rented or allowed his friend access to the room with the intention of facilitating the

friend's plan to prevent the witness from testifying. *Coleman*, 811 F.2d at 808.

These cases demonstrate that the Third Circuit standard for proof that the defendant knew of the specific illegal object of the charged conspiracy is a strict one. While the standard applied to a motion for acquittal is very favorable to the government, that standard does not lessen the heavy burden upon the government to prove at trial each element of the crime charged. With this standard in mind, I turn to the case before me.

### The Conspiracy Charged in Count One of the Indictment

The issue here is very precise: did the defendants knowingly agree to participate in the conspiracy charged in Count One of the Superseding Indictment to:

1) defraud the United States in the collection of excise taxes owed on the sale of diesel fuel;

2) use wire communications for the purpose of defrauding the Commonwealth of Pennsylvania and the State of New Jersey in the collection of Pennsylvania oil company franchise taxes and New Jersey motor fuels taxes and gross receipts taxes; and

3) structure financial transactions so as to evade the federal currency transaction reporting requirements.

The Indictment charges that this conspiracy operated from on or about October 1991 until on or about December 1, 1992. According to the Indictment, the primary means of accomplishing these objectives was through the use of "daisy chains".

### The Daisy Chain Scheme

Two petroleum products, home heating oil and diesel fuel, are the same chemical substance, known as No. 2 fuel oil. When No. 2 oil is sold as home heating oil, no special taxes are imposed on the sale. When the same product is sold as diesel fuel, however, substantial taxes are imposed on the sale.[2]

Under federal law, and under the laws of Pennsylvania and New Jersey during the period of the alleged conspiracy, a company dealing in No. 2 oil could obtain a license permitting it to sell No. 2 oil tax free to other companies that held the same license. The federal license is known as an IRS Form 637 (Form 637). The product could thus be transferred from refiner to distributor and among distributors without taxes being paid on it. Taxes would become due when the product was sold to an entity which did not hold a Form 637, generally a distributor or retailer of diesel fuel. The entity responsible for the collection and remittance of the taxes is the entity that initially sells the oil to a non-exempt company; the company that purchased the No. 2 oil as home heating oil and sold it as diesel fuel.

A "daisy chain" is a string of companies controlled by a single person or group of persons. In this case, No. 2 oil was transferred on paper from company to company through the daisy chain, first as home heating oil, but then as diesel fuel, so as to make it difficult to determine which entity was responsible for the payment of the taxes. The first several companies in the chain each would have a Form 637, and so would sell the oil as tax-exempt home heating oil. At some point in the chain the oil would be sold to a company that did not have a Form 637. At that point the oil would be sold as diesel fuel, at a higher price: the "tax paid" price. The taxes, however, were never remitted to the governments to which they were owed. Instead the oil was sold to a diesel fuel distributor at the "tax paid" price and the profit gained by not paying the taxes was divided among the conspirators.

Although the oil passed through a number of companies, in a number of different configurations, the same company always made the first taxable sale. This company was called the "burn" or "butterfly" company because it was a sham operation designed to "burn up" or "fly away" when the governments sought to collect the taxes owed. The conspirators here used two "burn" companies, both of which were sham operations making unauthorized use of the names, licenses, and signature stamps of legitimate oil companies.

---

**2.** There is a federal excise tax of approximately 20 cents per gallon imposed on the sale of diesel fuel. The Commonwealth of Pennsylvania and the State of New Jersey impose additional taxes of 10.35 and 17.5 cents per gallon, respectively, on the sale of diesel fuel.

The typical daisy chain would involve six or seven companies from beginning to end, and all of the transactions would occur on the same day.[3] In many of the transactions the oil itself never moved, since the company that originally sold the oil as home heating oil also bought it back as diesel fuel at the end of the chain, then distributed it to retailers. Other than the companies at the beginning and the end, the companies in the daisy chains had no function other than the transfer of oil on paper to other companies involved in the scheme. These sham companies typically were run out of one-room offices which contained only a telephone, fax machine, and a desk.

*Cash–Rendering Activities*

The Indictment alleges that the conspirators used three methods to convert their profits into cash:

1) the cashing of checks, money orders and wire transfers from the scheme at check cashing agencies;

2) using checks and wire transfers from the scheme to purchase home heating oil, which was then sold surreptitiously to truck stops (for resale as diesel fuel) in Western Pennsylvania, Ohio, and West Virginia; and

3) giving checks and wire transfers to one of the functioning oil companies involved in the scheme in exchange for cash that company was paid by an unrelated customer.

The Indictment also alleges that six members of the conspiracy used proceeds from the scheme to form American Enterprises, Inc., which exported American goods to Russia for resale.

The Indictment further alleges that this scheme defrauded the various governments out of more than $14 million between October 1991 and December 1992.

*Igor ·Veksler's Role in the Scheme*

Defendant Veksler does not dispute that he operated one of the companies involved in the daisy chains. In twenty-three separate transactions Veksler's company, IV Enterprises, bought oil from another company in the scheme and sold it to the "burn company".

Veksler testified that he became involved with the daisy chain operation when an old army buddy called him and offered him a job opportunity that the friend did not want. Veksler started IV Enterprises and incorporated it in Wisconsin. He applied for and received an IRS Form 637 in the name of IV Enterprises. Thereafter he received instructions from others in the daisy chain, particularly Dmitry Belokopytov and Nadia Shnayderman, as to every aspect of the operation of the business. He was told how to set up an office, provided with sample invoices and letterhead, and given form letters to send to other participants in the scheme, referring to business meetings and negotiations which never took place. He was told what company he would buy oil from and which company he would sell oil to, the mark-up he would take, and what quantities he would buy and sell. He knew that two of his friends would receive cash commissions on the oil that passed through his company, over and above the ·mark-up shown on his invoices. He was instructed by Dmitry Belokopytov about the difference, for tax purposes, between home heating oil and diesel fuel and told that it was very important that his invoices always reflect that it was home heating oil that he was buying and selling, so that the transactions would be tax exempt.

Belokopytov also told Veksler to call the IRS and confirm that his customer, Keroscene (the "burn" company), held a valid Form 637. When IV Enterprises was paid for the oil it sold to Keroscene, however, it received payment from Romans Penn or Petroleum Unlimited, the companies that Keroscene had sold the oil to, and not from Keroscene. Neither of these companies had a Form 637. Although Veksler knew that he could only sell home heating oil to a company that held a Form 637, he never checked whether the companies that were paying him had the Form. Payment for the oil came in the form of a wire transfer, so Veksler did not receive checks indicating the source of

---

**3.** One of the alleged reasons for the involvement of so many entities was to create as much paper as possible, so that it would be difficult for the government to figure out which company was responsible for the taxes.

payment, however, his bank statements revealed the source of the wire transfers.

After IV Enterprises was removed from the daisy chain in December 1991, Veksler spoke to several·members of the conspiracy in an effort to get back into the oil business. Belokopytov told Veksler that he could make some money if he would work directly with Belokopytov and allow his Form 637 to be used by others. Belokopytov testified that Veksler initially balked at the idea of excluding the friends who had made commissions from IV Enterprises' sales in the past. Belokopytov urged Veksler to consider the offer, but when Belokopytov contacted him later to learn his answer, Veksler reported that his Form 637 had been revoked by the IRS.

*Veksler's Motion for Acquittal*

■ The government presented ample evidence to allow a reasonable jury to conclude that Veksler knew that he was running a sham business and participating in some sort of illegal activity. The evidence showed that others, particularly Belokopytov, directed every aspect of Veksler's business, down to designating his supplier and customer and ordering the quantity of oil to be sold. Government witnesses also testified that two of Veksler's friends received cash commissions on his company's business, rather than being paid from the company's profits. Finally, when Veksler was excluded from the daisy chain he did not attempt to conduct business with other oil companies, but sought to be allowed back into the scheme. From this evidence the jury reasonably could infer that Veksler knew that he was involved in an illegal scheme. That is not enough, however, to sustain a conviction for conspiracy. Veksler must have had knowledge of the specific illegal objective of the scheme in which he was involved: the sale of No. 2 oil as diesel fuel without remitting the taxes owed to the government.

The government presented no direct evidence that Veksler knew that the home heating oil he sold was later sold as diesel fuel without the taxes being paid. There was, however, sufficient circumstantial evidence for the jury reasonably to infer that Veksler had that knowledge.

Veksler was instructed by Belokopytov in the difference between home heating oil and diesel fuel, for tax purposes. He was told that he could only sell to a company that held a Form 637, and was told that it was very important to check his customer's Form 637 with the IRS. He did not receive payment from his customer but from another company, which did not have a Form 637. Veksler never attempted to find out whether the companies that were paying him had Forms 637.

Furthermore, ·Veksler's payment came from the mark-up he charged when he sold the oil to Keroscene, but his friends received cash payments in excess of those "profits"; thus, Veksler knew that his operation was generating profits that did not show in his books, and the jury could reasonably infer that he knew that those profits were generated by the subsequent sale of the oil without the payment of taxes.

Finally, Veksler took the stand and testified that he did not understand the nature of the scheme; the jury was entitled to ˙disbelieve that statement. When Veksler presented evidence he waived his right to argue that the sole issue is whether the government has carried its burden; his testimony, whether believed or disbelieved, becomes part of the evidence in the case, and may be construed against him. *See United States v. Trotter,* 529 F.2d 806, 809 n. 3 (3d Cir.1976). The jury could ˙disbelieve Veksler's statement that he did not understand the nature of the scheme and draw an inference that he did, in fact, know what he was doing.

*Eduard Sikar's Role in the Scheme*

Eduard Sikar had a very different role from that of most of the other minor conspirators. He was not involved in the operation of any of the daisy chain companies, but was part of the operation identified in the Indictment as the second means used to extract cash from the daisy chains. Sikar was responsible for the sale of truckload quantities of No. 2 oil to truck stops in Western Pennsylvania, Ohio and West Virginia. From October 1991 to March 1992, Sikar would pick up No. 2 oil from the Texaco terminal in Coraopolis, Pennsylvania, and sell the oil to truck stop operators for cash. The oil was

purchased as home heating fuel and sold as diesel fuel. The oil was paid for with proceeds generated by the daisy chain scheme, and Sikar would deliver the cash to Nadia Shnayderman, the bookkeeper for the daisy chain scheme. No taxes were paid on the oil sales. Sikar was paid $500.00 in cash per week for this work. The government presented no direct evidence that Sikar knew of the connection between those oil sales and the daisy chain scheme.

In the spring of 1992, Sikar stopped delivering oil to truck stops and began working for David Shuster at the American Enterprises office in New York. There he was responsible for making arrangements for the purchase of American products for export to Russia.

*Sikar's Motion for Acquittal*

■ The issue I must address with regard to Sikar's motion is whether his participation in the sale of untaxed diesel fuel to truck stops in Western Pennsylvania, Ohio, and West Virginia, without proof that Sikar knew of the nexus between that activity and the daisy chain scheme, is enough under the Third Circuit standard to sustain his conviction on the conspiracy of the Indictment. I hold that it is not.

Although Sikar clearly participated in a scheme to sell No. 2 oil as diesel fuel without paying the taxes due, the government has not proven that he participated in the scheme that is charged in Count One of the Indictment. The Indictment charges a conspiracy involving the operation of the daisy chains. Without proof that Sikar's activities were linked to the daisy chain scheme, and that he knew it, his conviction under Count One cannot stand.

■ The fact that different members of a scheme perform different functions does not bar a finding that they all participated in a larger scheme, and that they are all guilty of the umbrella conspiracy. *United States v. Gomberg*, 715 F.2d 843, 846 (3d Cir.1983),

*cert. denied,* 465 U.S. 1078, 104 S.Ct. 1439, 1440, 79 L.Ed.2d 760 (1984). The test is whether a particular defendant was aware that he was working in aid of the larger conspiracy and its objectives. *Id.*[4]

This knowledge of the larger conspiracy and its objectives is precisely what the government has failed to prove as to Sikar. The government has presented nothing that proves that Sikar understood both that there was a larger conspiracy and that he was working in support of it, as required under Third Circuit law.

There is evidence that the oil that Sikar sold to truck stops was bought with money from the daisy chain operation, that Miles Martin and other members of the daisy chain conspiracy were also involved in the truckload sales of bootleg oil, and that the truckload sales of oil were a means of extracting cash from the daisy chain operation, but there is no evidence that Sikar knew any of this.

The evidence shows that Sikar understood that the truck stop oil sales he facilitated were illegal because taxes were not being paid on them, but does not show that he knew that his actions were linked to the use of daisy chains for avoiding the same taxes. The government's evidence that the truck stop operation netted over $200,000.00 in profits in about nine months does not, as the government argues, suggest that Sikar must have known that this independently profitable activity was part of a larger scheme.

There is evidence that American Enterprises was a partnership among members of the daisy chain scheme, that it was formed with money made from the daisy chain scheme, and that Sikar worked in the American Enterprises office when money from the daisy chains was brought in and counted by Belokopytov and Shnayderman. There is, however, no evidence that Sikar was aware of how the American Enterprises partners

4. The U.S. Attorney, during the hearing on Sikar's motion, argued that *Gomberg* holds that where the defendant "has a basis for knowing that there is a larger picture", he can properly be charged and convicted of being part of the larger conspiracy. After reviewing *Gomberg* and the other Third Circuit cases discussed above, I disagree that "a basis for knowing that there is a larger picture" is enough to sustain a conspiracy conviction. Even if the government's characterization is correct, I doubt that the standard is met here.

made their money or that Sikar knew of the source of the money that was brought in.

 There is evidence that Sikar had a longstanding relationship with David Shuster, one of the masterminds of the daisy chain scheme. It is settled law, however, that a defendant cannot be found guilty of conspiracy on the grounds that he kept "bad company" where there is no evidence that he knew of his associate's activities. *Wexler*, 838 F.2d at 91.

A fellow defendant testified that Sikar visited him shortly before trial and was upset about some of the things Belokopytov had said in his statements to the government. This comment does not amount to an admission that the statements Sikar was angry about were true.

Finally, the government presented testimony that, in August of 1992, David Shuster offered Sikar the chance to run one of the daisy chain companies, and that Sikar declined because he was told that he would have to use his own name. This occurred in August of 1992, at least four months after Sikar stopped delivering bootleg oil to truck stops and began working at American Enterprises. Although this testimony supports an inference that Sikar knew, in August 1992, of the daisy chain operation, it does not raise an inference that he knew of the scheme while he was delivering oil to truck stops before March of that year, or, if he knew, that he believed that he was in any way connected with that operation.

The government's evidence as to Sikar at trial does not meet the Third Circuit's standard for knowing participation in the charged conspiracy. None of the government's evidence reasonably raises an inference that Sikar understood both that there was a larger conspiracy and that he was working in support of it. I will grant Sikar's motion for acquittal.

### ORDER

**AND NOW,** this 31st day of August 1994, it is therefore **ORDERED** that the Motion of Igor Veksler for judgment of acquittal is **DENIED.** It is further **ORDERED** that the Motion of Eduard Sikar for judgment of acquittal is **GRANTED.**