

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-1996

# United States vs. Schramm

Precedential or Non-Precedential:

Docket 94-3619

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States vs. Schramm" (1996). *1996 Decisions.* Paper 253.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/253

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

—————

No. 94-3619

—————

UNITED STATES OF AMERICA

vs.

RONALD SCHRAMM; ANTHONY DeCELLO; OLEG
VINOKUROV, a/k/a Alex; MICHAEL ZUBINSKY,
a/k/a Steve; ASHOK TYAGI; AMINDERJEET S.
AULAKH, a/k/a Andy; AMARBIR SINGH, a/k/a
Sonny; MICHAEL DUBINSKI, a/k/a Steve

    ANTHONY DeCELLO,

                Appellant.

—————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. Criminal No. 93-cr-00188-02)

—————

ARGUED DECEMBER 12, 1995

BEFORE:  BECKER, ROTH and LEWIS, Circuit Judges.

(Filed January 30, 1996)

—————

W. Thomas McGough, Jr. (ARGUED)
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA  15219-1886

    Attorney for Appellant

Bonnie R. Schlueter
James H. Love (ARGUED)
Office of United States Attorney
633 U.S. Post Office & Courthouse
Pittsburgh, PA  15219

<u>          Attorney for Appellee</u>

_____

OPINION OF THE COURT
_____


LEWIS, <u>Circuit</u> <u>Judge</u>.

Anthony DeCello appeals from a conviction for conspiring to commit mail fraud for the purpose of avoiding Pennsylvania's Fuel Use Tax.  In his appeal, DeCello raises four issues:  (1) that there is insufficient evidence to support his conviction; (2) that the evidence adduced at trial established a prejudicial variance with the conspiracy charged in the indictment; (3) that his prosecution for conspiring to commit mail fraud violates principles of federalism; and (4) that the district court erred when it admitted a copy of his 1992 tax return at trial.

Because we agree with DeCello that there is insufficient evidence to support the jury's verdict, we need not address the remaining three issues.  For the reasons which follow, we will reverse DeCello's conviction.

I.

DeCello was indicted along with six co-defendants for criminal conspiracy in violation of 18 U.S.C. § 371.  The conspiracy count alleged a single conspiracy with two objects:

2

(a) to defraud the United States regarding federal diesel fuel excise taxes, and (b) to use the United States mail in an effort to defraud the Commonwealth of Pennsylvania with respect to the state's Fuel Use Tax, a tax imposed on the sale of diesel motor fuel.

## A. Factual Background

The conspiracy involved a scheme in which wholesalers and retailers attempted to avoid paying federal and state taxes imposed on what is known as "number two" fuel oil. Except for small variations in additives, "number two" fuel oil can be used as either home heating oil or diesel fuel. If used as diesel fuel, it is subject to a Federal Excise Tax of 20.1 cents per gallon. The Commonwealth of Pennsylvania imposes an additional 10.35 cents per gallon Oil Franchise Tax at the wholesale level, and an additional 12 cents per gallon Fuel Use Tax at the retail level. In contrast, when used as home heating oil, "number two" fuel oil is not subject to any taxes.

The fuel taxes are collected and reported by the respective sellers in the chain of commerce. Wholesale distributors of diesel fuel are required to collect the federal excise tax and the Commonwealth's Oil Franchise Tax, while retailers are required to pay a Highway Fuel Use Tax to the Commonwealth. Retailers must also file monthly fuel use tax reports which include, among other information, the name of all diesel fuel wholesale suppliers and the amount of diesel fuel purchased from each supplier during each reporting period.

3

Both federal and state law allow registered wholesale participants to buy and sell number two fuel oil in tax-free transactions. For example, wholesalers of diesel fuel are required to register with the Internal Revenue Service for Form 637 ("Registration For Tax Free Transactions"). This allows a registered wholesaler to sell diesel fuel to another registered wholesaler without paying the federal excise tax. Retailers and unregistered wholesalers, on the other hand, are not authorized to obtain Form 637. Consequently, any sale of diesel fuel to a retailer or to an unregistered wholesaler is subject to excise taxes.

The Commonwealth of Pennsylvania's excise tax law is subject to a similar registration system. All retail sales of diesel fuel are subject to Pennsylvania's Fuel Use Tax.

### B. The Scheme

The conspiracy in this case allegedly involved fuel wholesalers and retail truck stops attempting to escape the federal and state taxes imposed on diesel fuel. According to the Government, the conspiracy accomplished this by having the wholesalers invoice deliveries of taxable diesel fuel as nontaxable sales of home heating oil. The retailers who accepted delivery of this fuel paid in cash, kept the transactions off their official books, adjusted the oil meters, mingled the untaxed oil with oil that had been taxed and acquired from other wholesalers, and filed false tax returns. In this way, both the wholesalers and retailers avoided paying their respective taxes. By avoiding these taxes, the wholesalers were able to undercut

4

the prices charged by legitimate wholesale competitors.  The retailers were then able to purchase diesel fuel at lower prices and keep the transactions entirely off their books.

This particular scheme was the brainchild of Leon Uzdin, who began his operations in the Philadelphia area, and expanded them westward to the Pittsburgh area.  According to the indictment, Anthony DeCello participated in Uzdin's operation in several ways:  first, by recruiting haulers to deliver the fuel to the participating truck stops; second, by picking up the payments from the truck stops; and third, by delivering the cash payments to the scheme's principals.  In return, according to the indictment, DeCello received a commission and expenses.  Finally, when Uzdin's relationship with a fuel supplier began to sour, DeCello helped recruit a new fuel source.

DeCello and Uzdin initially met with Terry Tyhonas, a hauler recruited by DeCello.  At that meeting, DeCello asked Tyhonas to furnish "[s]ome fuel with a paper and some fuel without a paper." (i.e., with and without tax).  After Tyhonas turned them down, DeCello found Ronald Schramm, president of Judy Oil Co.  Schramm agreed to furnish the fuel oil and invoice the sales to Main Line as home heating oil.  This relationship continued for almost a year, during which Judy Oil furnished Uzdin with approximately eight million gallons of diesel fuel.  For his efforts in recruiting Schramm, DeCello was promised a commission of one cent per gallon.

All of the participants allegedly filed false tax returns during the scheme.  Judy Oil filed quarterly federal

5

excise tax returns which omitted all of the taxable sales that were occurring between Judy Oil and the various retailers involved in the scheme. The retailers involved filed federal and state income tax reports which omitted untaxed deliveries and sales of diesel fuel. In addition, DeCello filed a federal income tax return in 1992 in which he allegedly omitted payments and commissions obtained from Uzdin.

Five of DeCello's six co-defendants entered guilty pleas to the conspiracy charge. DeCello and Schramm proceeded to trial. The jury convicted DeCello on the conspiracy charge, and convicted Schramm on conspiracy and other charges. Through special verdict forms, the jury concluded that Schramm conspired to defraud the United States and, as we will develop more fully below, that DeCello conspired to commit mail fraud. DeCello's post-trial motions were denied and this appeal followed.

The district court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

II.

The principal issue before us is whether there was sufficient evidence to support the jury's conclusion that DeCello entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment, particularly, to evade and defeat Pennsylvania's Fuel Use Tax. United States v. Scanzello, 832 F.2d 18, 20 (3d Cir. 1987). Our review of this issue is circumscribed by the fundamental principle that:

6

> [i]t is not for [an appellate court] to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.

United States v. Glass, 315 U.S. 60, 80 (1942). A verdict will only be overturned "if no reasonable juror could accept the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987). Consequently, a "claim of insufficiency of the evidence places a heavy burden on an appellant." United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992) (quoting United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990)).

Nonetheless, the government must prove each element of a conspiracy beyond a reasonable doubt, and we have noted that "the sufficiency of the evidence in a conspiracy prosecution requires close scrutiny." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987). There must be substantial evidence establishing "a `unity of purpose,' intent to achieve a common goal, and an agreement to work together toward that goal." McGlory, 968 F.2d at 321 (quoting United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988)). Although all of the elements of the government's case, including the existence of the agreement, may be proven entirely through circumstantial evidence, United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986), "there must be evidence tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." Scanzello, 832 F.2d at 20.

7

## A. The Indictment

The indictment charged DeCello and his co-defendants with a single conspiracy which sought to accomplish two purposes. One purpose, set forth in paragraph 18(a) of the indictment, was to:

> [d]efraud the United States Department of the Treasury and the Internal Revenue Service, a department and agency of the United States, by impeding, impairing, obstructing, and defeating the lawful government functions of the Department of the Treasury and the Internal Revenue Service in the ascertainment, computation, assessment, and collection of the revenue; to wit, <u>federal diesel fuel excise taxes</u>.

App. at 194 (emphasis added). The second purpose, set forth in paragraph 18(b), was entirely different in that it involved a different underlying offense (mail fraud) and a completely different type of fuel tax. Here, the grand jury charged that DeCello conspired to:

> [d]evise and execute a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises, furthered by the use of the United States mail, <u>particularly, to evade and defeat the full payment of the Fuel Use Tax imposed on the sale of diesel motor fuel under the laws of the Commonwealth of Pennsylvania</u> in violation of Title 18, United States Code, § 1341 (Mail Fraud).

App. at 194-95 (emphasis added).

The court provided the jury with a special verdict form which permitted the jury, if they found DeCello guilty of conspiracy, to select paragraph 18(a) and/or paragraph 18(b) as the purpose and object of the conspiracy agreed to by DeCello.

8

The jury marked the purpose and object corresponding to paragraph 18(b), specifically that DeCello had agreed to "violate federal law, namely federal law prohibiting mail fraud."

DeCello argues that the evidence produced by the government was insufficient to sustain his conspiracy conviction because at best, it established that he knowingly participated in a scheme to evade federal wholesale taxes, the subject of paragraph 18(a), but failed to establish that he knowingly entered into an agreement to use the United States mail to evade and defeat the full payment of Pennsylvania's Fuel Use Tax, which is the focus of paragraph 18(b). We agree. Our review of the record leads us to conclude that the government failed to present sufficient evidence to support the jury's conclusion that DeCello ever agreed to participate in, or had any knowledge of, the retailers' evasion of Pennsylvania's Fuel Use Tax.

B.

Specifically, there is simply no evidence to indicate that DeCello ever met or communicated with any of the truck stop owners; that he was even aware of, let alone sought to evade, the Pennsylvania Fuel Use Tax; or that any of DeCello's alleged co-conspirators at the wholesale level were aware of, authorized, or participated in the evasion of diesel fuel retail taxes.

The government asks us to draw certain inferences from circumstantial evidence it relied upon to support the conclusion that DeCello had knowledge of the retailers' evasion of Pennsylvania's Fuel Use Tax.

9

First, the government notes that Uzdin testified that he informed DeCello of his reasons for terminating a prior operation, and that DeCello was aware of the price the truck stops were paying for the oil. Second, the government points out that DeCello assisted Uzdin in recruiting a new supplier of fuel, recruited haulers for the fuel, and handled payments collected from the various truck stops. Consequently, the government suggests, that DeCello must have played an integral role in the conspiracy and should have had knowledge of the retailers' criminal actions. Finally, the government argues that DeCello must have been aware of the retailers' tax evasion because the evasion of both retail and wholesale taxes was required to confound the so called "audit trail." In other words, if either the retailers or wholesalers reported and paid their applicable taxes, they would expose the others' tax evasion because there would be inconsistencies between the wholesalers' and retailers' records.

These arguments, however, are insufficient to support the jury's verdict. As the government concedes, DeCello "was a supply-sider throughout" the entire scheme. (Appellee's Br. at 28). Although DeCello appears to have been an active participant in the wholesale aspects of Uzdin's operation, the only inference to be drawn from this evidence is that DeCello's participation might have made him aware of the suppliers' evasion of diesel fuel wholesale taxes. We cannot overlook the fact that Uzdin's activities with his suppliers were limited to the wholesale side of the diesel fuel market. Similarly, DeCello's effort to

10

recruit a new supplier of fuel oil "without a paper," or without Form 637, involved the avoidance of the Federal Excise Tax imposed at the wholesale level. Moreover, Uzdin's testimony during the government's direct examination merely establishes that the suppliers were avoiding federal wholesale taxes:

> Q. And you would take your 637 form and you would present it or cause it to be presented to other buyers and sellers of fuel?
>
> A. To the seller, yes. Supplier or terminal.
>
> Q. To the terminal that you were buying from?
>
> A. Yeah.
>
> Q. And by doing that you had no tax?
>
> A. Yeah. <u>We got product, we pay only state tax and whatever other tax besides federal tax</u>.
>
> Q. You paid no federal tax?
>
> A. No.

App. at 18 (emphasis added). Uzdin never mentioned retail taxes in any of his testimony. There is nothing to indicate that DeCello's participation with Uzdin gave him any knowledge of the retailers' subsequent criminal activities; quite to the contrary, it appears that the supply-siders' interest in the oil ended when the oil was sold and delivered to the truck stops. The government produced no evidence to demonstrate that the suppliers were concerned with how the retailers subsequently treated and disposed of the oil.

11

Similarly, DeCello's awareness of what the retailers were paying the suppliers for the fuel oil has no bearing on whether or not he knew that the retailers were avoiding their taxes. Once again, at best this merely proves that he was or should have been aware of <u>the suppliers</u>' tax evasion. Uzdin testified that he purchased the oil from his supplier at two and a half cents and up to four and a half cents per gallon over rack price ("rack price" is the price for which fuel is sold at the refiner's terminal), and that he charged the truck stops twelve cents over rack price. This left Uzdin with a gross profit of approximately seven to nine cents per gallon. From this, Uzdin ostensibly paid both DeCello and another alleged conspirator one cent per gallon, leaving him five to seven cents per gallon to pay approximately thirty cents in state and federal wholesale taxes, cover other expenses, and derive some profit. Because Uzdin testified that he discussed these matters with DeCello, one could infer that DeCello knew or should have known that Uzdin was evading the wholesale taxes. Otherwise, Uzdin would be losing approximately twenty-three cents per gallon. This, however, is not enough to allow a reasonable juror to infer that DeCello knew that the retailers were then evading their taxes as well. Even if the evidence demonstrated that DeCello not only knew the price the retailers were paying for the fuel oil but also the price they charged the public, that knowledge would still be insufficient to establish beyond a reasonable doubt that DeCello knew the retailers were not paying their taxes. At best, this evidence might allow a reasonable juror to conclude that DeCello

12

knew that the retailers were profiting by buying fuel oil at below market rates.

Finally, as to the government's argument that the evasion of one set of taxes necessarily requires the evasion of all diesel fuel taxes, we believe that this ignores the fact that there were other ways for retailers to evade their taxes without the cooperation of the suppliers. For example, the retailers could simply have falsified their monthly and annual reports by misrepresenting the amount of diesel fuel received regardless of the wholesale source; or the truck stops could have misrepresented the amount of diesel fuel sold. Neither of these methods would have required the participation of wholesalers. No doubt, the retailers' efforts were facilitated and their profits increased by the suppliers' illegal activities in this case, but that does not lead to the conclusion that the suppliers were aware of, let alone agreed to participate in, the retailer's effort to avoid the applicable retail tax.

We, therefore, cannot conclude that the evidence adduced at trial allows a "reasonable inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." Kapp, 781 F.2d at 1010. Upon our independent review of the record, we must conclude that the government provided insufficient evidence to demonstrate that DeCello knew or should have know that the retailers intended to evade their taxes. Although DeCello's actions may have aided the retailers in their tax evasion, we have repeatedly held that to sustain a

conspiracy conviction, the government must establish that a defendant had knowledge of the specific illegal object of the conspiracy. See, e.g., United States v. Salmon, 944 F.2d 1106, 1114-16 (3d Cir. 1991) (reversing the conviction of a defendant who aided in the sale of a wrapped package, but had no knowledge of the contents); United States v. Wexler, 838 F.2d 88, 91-92 (3d Cir. 1988) (holding that a defendant's participation as a lookout and assisting in the movement of a truck that contained a large quantity of hashish was insufficient to sustain a conviction for conspiring to distribute hashish in the absence of any evidence that the defendant knew what was in the truck); United States v. Cooper, 567 F.2d 252, 254-55 (3d Cir. 1977) (reversing the conspiracy conviction of a defendant who travelled cross-country with a co-defendant in a truck carrying marijuana because there was no evidence that the defendant knew what was in the locked compartment of the truck); United States v. Veksler, 862 F. Supp. 1337, 1343 (E.D. Pa. 1994) (acquitting a participant in the sale of untaxed diesel fuel to truck stops even though the evidence showed that the defendant knew that the truck stop oil sales he facilitated were illegal because there was no evidence to demonstrate that the defendant was aware that he was working in aid of a larger conspiracy and its objectives), aff'd 62 F.3d 544 (3d Cir. 1995).

## C.

The district court upheld the jury's verdict based upon a different theory. According to the district court, the jury convicted DeCello for participating in a single unified

conspiracy to sell "Number 2 fuel oil for taxable purposes under the guise of selling Number 2 fuel oil for non-taxable purposes," and there was sufficient evidence to support that conclusion. United States v. Schramm, No. 93-188, slip op. at 16 (W.D. Pa. Aug. 16, 1994). To reach this result, however, the district court implicitly interpreted paragraph 18(b)'s reference to Pennsylvania's Fuel Use Tax as illustrative rather than exclusive. Under the district court's interpretation, the conspiracy charge in paragraph 18(b) necessarily includes evasions of Pennsylvania's Fuel Oil Franchise Tax imposed at the wholesale level. Consequently, the district court was able to affirm DeCello's conviction based upon his participation in and awareness of the fuel oil suppliers' evasion of their applicable wholesale taxes. Under any other interpretation of the indictment, the district court's conclusion would run afoul of the rule that the evidence must establish that the defendant entered into an agreement and "knew that the agreement had the specific unlawful purpose charged in the indictment." Scanzello, 832 F.2d at 20 (emphasis added). But even if we were to agree that the evidence supported the conclusion that DeCello agreed to participate in a scheme which had the purpose of evading Pennsylvania's Oil Franchise Tax, we would not agree with the district court's interpretation of the indictment, and must, therefore, reverse DeCello's conviction.

While an indictment must generally be taken as a whole, read reasonably and given fair construction, United States v. Markus, 721 F.2d 442, 443-44 (3d Cir. 1983); United States v.

15

<u>King</u>, 587 F.2d 956, 963 (9th Cir. 1978) (stating that appellate courts "should read an indictment in a common sense manner, [and] refus[e] to reverse a conviction because of minor deficiencies in the indictment that could not have prejudiced the defendant . . ."), "[t]he precise manner in which an indictment is drawn cannot be ignored . . . ." <u>Sanabria v. United States</u>, 437 U.S. 54, 65–66 (1978) (emphasis added). The principle that an indictment must contain the essential elements of the offense charged is premised upon three distinct constitutional commands which we cannot ignore. First, the indictment must be sufficiently precise to inform the defendant of the charges against which he or she must defend, as required by the Sixth Amendment. Second, the indictment must enable an individual to determine whether he or she may plead a prior acquittal or conviction to bar future prosecutions for the same offense, in accordance with the Fifth Amendment. <u>Id.</u>; <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974); <u>Hagner v. United States</u>, 285 U.S. 427, 431 (1932). To accomplish these goals, an indictment must specifically set forth the essential elements of the offense charged. <u>Hamling</u>, 418 U.S. at 117. <u>See</u> <u>also</u> Fed. R. Crim. P. 7(c)(1) ("The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."). Third, the:

> purpose of an indictment is to shield a
> defendant in a federal felony case from
> unfounded prosecutorial charges and to
> require him to defend in court only those
> allegations returned by an independent grand
> jury, as provided by the Fifth
> Amendment. . . . By sufficiently

16

> articulating the critical elements of the
> underlying offense, an indictment insures
> that the accused has been duly charged by the
> grand jury upon a proper finding of probable
> cause, and will be convicted only on the
> basis of facts found by that body.

United States v. Boffa, 513 F. Supp. 444, 466 (D. Del. 1980)

(citing United States v. Goldstein, 502 F.2d 526, 528-29 (3d Cir.

1974)).

In cases which involve a conspiracy charge, the illegal

object of the conspiracy is an essential element of the offense

and must be included in the indictment.  See United States v.

Shaffer, 383 F. Supp 339, 342 (D. Del. 1974).

As discussed earlier, Count I of the indictment, which

charges a conspiracy, sets forth two purposes.  The jury

convicted DeCello of agreeing to accomplish the second purpose.

The second purpose, which was set forth in paragraph 18(b), was

to devise and execute a scheme and artifice to defraud by the use

of the United States mail, "particularly, to evade and defeat the

full payment of the Fuel Use Tax imposed on the sale of diesel

motor fuel under the laws of the Commonwealth of Pennsylvania

. . ."  App. at 194-95 (emphasis added).  To accept the district

court's conclusion, we would be required to interpret

"particularly" as used in paragraph 18(b) to mean "for example"

or "as one example among others," and to assume that the "other"

charges to which the word "particularly" refers included the

evasion of taxes not set forth in the paragraph itself.  But the

word "particularly," as it appears in paragraph 18(b), is

synonymous with "to-wit," a term commonly used in indictments to

17

refer to a discrete event. Likewise, "particularly" as used here is synonymous with the more conventional "specifically," which, in fact, is used in paragraph 18(a) of the indictment. See Merriam Webster, Webster's Ninth New Collegiate Dictionary 858 (1985). Both terms ("specifically" and "particularly") are used to set forth detailed descriptions of the conspiracy's goals; they are exclusive, not inclusive. If the government had intended to charge DeCello with agreeing to participate in a scheme to violate Pennsylvania's wholesale tax as well, it easily could have, and certainly should have, done so.

While courts must ignore minor and technical deficiencies in an indictment, Russell v. United States, 369 U.S. 749, 763 (1962) ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused."); Hagner v. United States, 285 U.S. 427, 433 (1932) (holding that courts must "disregarded merely loose or inartificial forms of averment."), an indictment's failure to specify the object of a conspiratorial agreement cannot be considered a minor or technical deficiency which can be ignored. As we have said, "[t]he essence of a conspiracy is an agreement." United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989). The goal or goals of the agreement are, therefore, essential elements of the crime of conspiracy itself. An omission such as occurred here deprives the defendant of one of the significant protections which the guaranty of a grand jury indictment is intended to confer. By not specifying the evasion of the federal excise tax or of Pennsylvania's wholesale fuel tax as one of the goals of

18

the conspiracy in paragraph 18(b), the indictment failed to apprise DeCello "with reasonable certainty, of the nature of the accusations against him." Russell, 369 U.S. at 766 (quoting United States v. Simmons, 96 U.S. 360, 362 (1877)). To adopt the district court's interpretation of the indictment would be to allow DeCello's "conviction to rest on one point and the affirmance of the conviction to rest on another," giving "the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture." Russell, 369 U.S. at 766. This we cannot do.

Paragraph 18(b) of the indictment alleges only that DeCello agreed to use the United States mails to evade Pennsylvania's Fuel Use Tax. It does not allege an agreement to evade any wholesale level taxes, and we cannot interpret paragraph 18(b) of the indictment as implicitly including the evasion of such taxes as additional goals of the conspiracy.

### III.

Because the government failed to produce sufficient evidence at trial to convince the jury to convict DeCello under paragraph 18(a) of the indictment and because the government further failed to prove that DeCello entered into an agreement and knew that the agreement had the specific unlawful purpose charged in paragraph 18(b) of the indictment, we will reverse DeCello's conviction and direct the entry of a judgment of acquittal.

_____

19